UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROBERT W. SCHEFFY JR., ET AL. | * | CIVIL ACTION NO. 23-565 |
| | * | |
| | * | DIVISION 1 |
| VERSUS | * | |
| | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| JOEL LYONS, ET AL. | * | |
| | * | |
| *********************************** | * | |

<u>ORDER AND REASONS</u>

This lawsuit arises out of a business deal for the purchase, renovation, and sale of certain buildings in New Orleans. Before the Court are Chandelier Development Inc.'s Motion to Dismiss Plaintiffs' Complaint Pursuant to Rule 12(b)(2) (Rec. Doc. 17); Joel Lyons, Chandelier Development Inc., and Chandelier Development NOLA LLC's Partial Motion to Dismiss Plaintiffs' Complaint Pursuant to Rule 12(b)(6) (Rec. Doc. 18); and Mark Larimore and RAM Enterprises, Inc.'s Motion to Dismiss Plaintiffs' Complaint (Rec. Doc. 19).

Plaintiffs have failed to allege sufficient facts to state a claim under the federal Racketeer Influenced and Corrupt Organizations Act or Louisiana's Racketeering Law. These claims must be dismissed. Plaintiffs' claims for civil conspiracy, fraudulent inducement, conversion, and detrimental reliance are prescribed because plaintiffs knew or should have known by March 2021 of their potential tort claims. These claims must be dismissed with prejudice. Plaintiffs' suit on open account is also prescribed because it was filed more than three years after payment was due. This claim must be dismissed with prejudice. Plaintiffs have failed to plead sufficient facts to state a claim for bad faith breach of contract. This claim must be dismissed. Plaintiffs have failed to state a claim for unjust enrichment because they have other remedies available. These claims must be dismissed with prejudice. Plaintiffs have failed to plead sufficient facts to establish liability of

1

Chandelier Development Inc. as part of a single business enterprise or the liability of Lyons as an alter ego of Chandelier Development NOLA, LLC, or Chandelier Development Inc. These claims must be dismissed.

Accordingly and for the following reasons, the Chandelier Defendants' Partial Motion to Dismiss (Rec. Doc. 18) is GRANTED; Chandelier Development, Inc.'s Motion to Dismiss Pursuant to Rule 12(b)(2) (Rec. Doc. 17) is DENIED as moot; and the Larimore Defendants' Motion to Dismiss (Rec. Doc. 19) is GRANTED.

<u>Background</u>

As noted, this lawsuit arises out of a business deal to purchase, renovate, and sell real estate for profit. Plaintiffs Robert W. Scheffy, Jr. ("Rob Jr."), Robert W. Scheffy III ("Robert III"), and Scheffy Construction, LLC allege they were defrauded by the defendants—Joel Lyons, Chandelier Development Inc. ("Chandelier TN"), Chandelier Development NOLA LLC ("Chandelier NOLA"), Mark Larimore, and RAM Enterprises, Inc., d/b/a RAM Floors—into investing in the project. Despite defendants' promises, the plaintiffs say they were only paid a portion of the sums due for their construction and maintenance work. And Rob Jr. was never returned his $125,000 investment or the interest purportedly due thereon. Further, plaintiffs say that none of them have seen the share of profits they are allegedly owed. It appears that only one part of the deal—construction and renovation of the property at 628 Esplanade by Scheffy Construction—was ever made subject to a formal, written contract.

According to the plaintiffs, the deal between the parties was presented to Robert III and/or Scheffy Construction by email on July 8, 2016.[1] It was suggested that a limited liability company would be set up to obtain financing from a bank, purchase the property, and contract with Scheffy

---

[1] The Complaint does not identify who sent the email, but Plaintiff's RICO Case Statement, filed in accordance with this Court's Standing RICO Order, asserts that Lyons was the author of the email.

Construction for the construction work. This contract would include an agreement "for profit share on the performance of the project." Rob Jr. and the sender of the email "would have a separate agreement with each investor and agreement on return on their investments." Two properties across the street from each other at 625 and 628 Esplanade Avenue would be purchased, although the Complaint does not indicate how or when this was communicated or who was involved in the communication. Plaintiffs also say that defendants estimated profits of between $2.8 million and $3.2 million in an effort to induce them to agree to the deal, although again, they do not specify who provided the estimate, or when or how it was provided.[2]

Plaintiffs allege that Robert III agreed to provide construction services in return for 25% of the profits and revenue. A draft of the operating agreement provided that Robert III would get 27.5% of the net profits and 12% interest on any capital contribution, although plaintiffs admit that this operating agreement was never executed.

In August 2017, Lyons reported that cash flow was good but that they would soon need to obtain additional capital sources. In December 2017, the defendants reached out to Rob Jr. to discuss an investment of $125,000 into the deal. Defendants agreed to prepare documentation. Although no such documentation was ever provided, Rob Jr. provided a check for $125,000 to the defendants. He claims he was supposed to receive 25% of the profits and revenue or, at the very least, the payment back of his contribution with interest. The Complaint does not allege who agreed to this return on investment, when, or how. According to plaintiffs' RICO Case Statement, Lyons told Rob Jr. a year later in December 2018 that he considered the investment a capital contribution, and in a June 2019 email, Lyons stated that the investment earns 12% annually.

---

[2] Around the same time—March 2017—plaintiffs assert in their RICO Case Statement that Lyons began pushing Robert III to bring his father, Rob Jr., into the deal.

Plaintiffs allege that Chandelier NOLA purchased 625 Esplanade in August 2016 for $300,000 with the intent of having Scheffy Construction renovate and/or construct condominiums in the building for re-sale and profit. Instead, Chandelier NOLA sold the building prior to any construction or renovation in December 2019 for $500,000. Plaintiffs allege that prior to the sale, they and the defendants entered into a sharing agreement[3] pursuant to which Robert III/Scheffy Construction would receive $50,000 in profit, Rob Jr., would receive $50,000 in profit, and the remaining $100,000 in profit would go to the defendants. But defendants have never paid the amounts due to "Scheffy."[4]

Plaintiffs allege that Chandelier NOLA purchased 628 Esplanade in August 2016 for $1,527,800 with the intent of having Scheffy Construction renovate and/or construct condominiums in the building for re-sale and profit. Scheffy Construction executed a contract with Chandelier NOLA to perform construction work on 628 Esplanade (the "Construction Contract"). Plaintiffs say that Robert III reduced Scheffy's fee on the Construction Contract from 15% to 12% to reduce costs.

According to plaintiffs' RICO Case Statement, Chandelier NOLA issued twelve checks to Scheffy Construction between July 2017 and September 2018, for payments totaling approximately $950,000. Scheffy Construction submitted its Final Payment Application in September 2018, and the final inspection was completed in December 2018. Rob Jr.—an attorney—allegedly provided legal services in connection with subdividing 628 Esplanade into condominiums. Robert III and/or Scheffy Construction allege they provided property management services in an effort to prepare 628 Esplanade for development, construction, and maintenance.

---

[3] Plaintiffs do not allege whether the alleged sharing agreement was reached orally or in writing.
[4] It is unclear whether plaintiffs mean all of the plaintiffs by "Scheffy" or whether they mean only Scheffy Construction.

On April 30, 2020, Scheffy Construction provided the defendants with a written demand for payment of the Final Payment Application. Yet no payment has been made. Plaintiffs allege a balance of $240,642, plus interest, remains outstanding.[5]

Plaintiffs allege further that the defendants did not sell 628 Esplanade as they had promised. Instead, they leased out the four condominium units beginning in October 2019. Plaintiffs believe rents of $700,000 have been collected to date. Plaintiffs insist that they are entitled to 50% of the revenues or profits from the leases. But they have not been paid any portion.

Plaintiffs filed this lawsuit on February 14, 2023. Plaintiffs attempt to assert claims against all defendants under the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1964(c). They allege that defendants fraudulently induced them to contribute money, legal services, property management services, and construction services to the defendants' scheme. Plaintiffs allege that they would press the defendants for paperwork to evidence the parties' agreements, but they were ignored. They say that every promise and agreement between plaintiffs and defendants was broken, obfuscated, or breached. They claim $240,642 plus interest at an annual rate of 12% remains owing under the Construction Contract. They claim the defendants failed to pay Robert III $25,000 for property management services. And they say that the defendants failed to pay profits from the sale of 625 Esplanade and from the leases on 628 Esplanade to Scheffy and failed to return $125,000 to Rob Jr. They say that the defendants continued to promise plaintiffs they would be paid for their work and investments until March 2021.

Scheffy Construction also asserts a claim for breach of contract against Chandelier NOLA, along with a bad faith breach of contract claim. It also asserts a suit on open account against

---

[5] Robert III and/or Scheffy Construction allege they have received payments of $1,040,646.29 for their work on both properties.

Chandelier NOLA for a past due balance of $240,642, plus interest. All plaintiffs assert a claim for unjust enrichment and a claim for detrimental reliance against all defendants. They also allege that Chandelier NOLA and Chandelier TN constitute a single business enterprise. They allege further that Chandelier NOLA and/or Chandelier TN are the alter egos of Lyons. Rob Jr. also asserts, in the alternative, a claim for breach of contract against Chandelier NOLA arising out of his alleged $125,000 loan.

Plaintiffs allege that as a result of defendants' fraudulent acts, breaches of contract, and RICO violations, defendants are liable to plaintiffs for approximately $715,642.

On March 30, 2023, defendants appeared and filed motions to dismiss. Chandelier TN seeks dismissal under Rule 12(b)(2) for lack of personal jurisdiction. Lyons, Chandelier Development and Chandelier NOLA (collectively the "Chandelier Defendants") seek dismissal of all plaintiffs' claims against them, except for the claim for breach of the Construction Contract, pursuant to Rule 12(b)(6).[6] Defendants Larimore and RAM Enterprises (collectively the "Larimore Defendants") seek dismissal of all claims against them pursuant to Rule 12(b)(6).

<u>Law and Analysis</u>

1. *Rule 12(b)(6) Motion to Dismiss*

    a. *Standard*

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." <u>Cuvillier v. Taylor</u>, 503 F.3d 397, 401 (5th Cir. 2007) (quotation marks and ellipsis omitted). Accordingly, Rule 12(b)(6) allows a defendant to

---

[6] The Chandelier Defendants argue "this is a breach of contract action, plain and simple" and "recognizing what this suit is, the Chandelier Defendants do not seek dismissal of plaintiff's breach of contact claims against Chandelier NOLA." Rather, they "seek dismissal of all the absurd or extraneous or untimely claims asserted in Counts I-III and V-XII of plaintiffs' complaint." They advise they will be filing a counterclaim themselves, against the plaintiffs.

move for expeditious dismissal when a plaintiff fails to state a claim upon which relief can be granted. In ruling on a 12(b)(6) motion, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." <u>In re</u> <u>Katrina Canal Breaches Litigation</u>, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted). Further, "[t]o survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to state a claim to relief that is plausible on its face. Factual allegations must be enough to raise a right to relief above the speculative level." <u>Id</u>. (citation, footnote, and quotation marks omitted). On that point, the United States Supreme Court has explained:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citations and quotation marks omitted).

"In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto." <u>Collins v. Morgan Stanley Dean Witter</u>, 224 F.3d 496, 498 (5th Cir. 2000). The Fifth Circuit has recognized that the court may also consider documents attached to a motion to dismiss by the defendant if they are referred to in the plaintiff's complaint and central to her claim. <u>Id.</u> at 498-99; <u>see</u> <u>Villarreal v. Wells Fargo Bank, N.A.</u>, 814 F.3d 763, 766 (5th Cir. 2016).

In addition, Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." <u>Id.</u> "The particularity standard of Rule 9(b) generally requires the plaintiff to plead the

time, place, and contents of the false representation and the identity of the person making the representation." United States v. Bollinger Shipyards, Inc., 775 F.3d 255, 260 (5th Cir. 2014). This standard "ensures the complaint 'provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs.'" U.S. ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009) (quoting Melder v. Morris, 27 F.3d 1097, 1100 (5th Cir. 1994)).

     *b.  RICO*

"In order to state a claim under 18 U.S.C. § 1962, a plaintiff must allege: 1) the conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity." Elliott v. Foufas, 867 F.2d 877, 880 (5th Cir. 1989). "[A] RICO plaintiff must plead the specified facts as to each defendant. It cannot avoid Rule 12(b)(6) by 'lumping together the defendants.'" In re Mastercard Int'l Inc., 132 F. Supp. 2d 468, 476 (E.D. La. 2001) (quoting Goren v. New Vision Int'l, 156 F.3d 721, 730 (7th Cir. 1998)).

Here, defendants challenge the sufficiency of plaintiffs' complaint as to racketeering activity, pattern, and the existence of an enterprise. The Larimore Defendants also argue that the complaint fails to allege sufficient facts to implicate them at all.

     *i.  Racketeering Activity: Predicate Acts*

Predicate acts are the criminal acts listed in the statute's definition of "racketeering activity," 18 U.S.C. 1961(1), which serve as the predicate for a RICO violation.  See 1 Civil RICO ¶ 2.01 (2023) Lexis Nexis. Here, the alleged predicate acts are mail fraud (18 U.S.C. §1341[7]) and

---

[7]  Mail fraud is when "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such

wire fraud (18 U.S.C. § 1343[8]). To establish these offenses, the plaintiff must show a scheme to defraud, specific intent to defraud, and the use of the mails or wire communications, respectively, to execute the scheme. Robinson v. Standard Mortg. Corp., 191 F. Supp. 3d 630, 639 (E.D. La. 2016). The Rule 9(b) pleading standard, requiring particularity of the circumstances constituting the fraud, applies to the predicate acts in a RICO claim. Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1138 (5th Cir. 1992). For example, in Tel-phonic, the Fifth Circuit found sufficiently particular the allegation that defendant wrote a letter on April 27, 1983 "with false representations inducing plaintiffs to change the agreement to allow [defendant] to sell two new systems to the Bell subsidiary falsely representing that [defendant] would buy back two systems from plaintiff." Id. at 1139. But the court found that the plaintiff's allegations that defendants had used the phone or mails to refuse to send personnel despite an agreement to provide technical assistance, to "coerece payments" from the plaintiffs under an agreement that did not exist, and to "coerce plaintiff out of its contractual benefits if plaintiff would agree to eliminate 'certain ambiguities,'" did not state a claim for wire fraud because they failed to identify any specific misrepresentation of fact or false promises. Id.  at 1139 n. 3.

In In re Burzynski, a doctor alleged a RICO claim against an insurer, its law firm, and its litigation consultant arising out of the defendants' efforts to avoid reimbursing the doctor for non-FDA approved cancer treatment based on anti-neoplastins. 989 F.2d 733, 737 (5th Cir. 1993). Id.

---

counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing . . . ." 18 U.S.C. § 1341.

[8] Wire fraud is when "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice . . . ." 18 U.S.C. § 1343.

at 737. The Fifth Circuit held the following allegations of fraud were sufficient to satisfy the predicate acts of a RICO claim: the insurer's letter to other insurers urging them not to reimburse the doctor for the anti-neoplastin treatment, the law firms' allegedly fraudulent pleadings in the litigation to obtain reimbursement, the consultant's false federal grant applications for a company allegedly created to generate negative reviews for the doctor's treatment, the provision of false information about the doctor to federal investigators to try to initiate an investigation, and the insurer's denial of coverage to its own insureds for the doctor's treatment. Id. at 742.

But certain allegations in Robinson v. Standard Mortgage Corp. were found insufficient by the district court. 191 F. Supp. 3d 630, 639 (E.D. La. 2016). There, the plaintiff alleged RICO claims against her mortgage company, the insurer on the insurance policy the mortgage company force placed, and their affiliates arising out of an alleged scheme to defraud borrowers by overcharging them for force-placed insurance. Id. at 636-37. The court found that allegations that the defendants initiated certain mail and/or wire communications that were materially false and misleading, without any further detail about the contents of the alleged documents, lacked the specificity demanded by Rule 9(b). Id. at 639. The court further found that although the plaintiff provided additional detail about other communications, the disclosures included in those communications defeated any claim of fraud or misrepresentation therein. Id. at 640.

Here, the Chandelier Defendants argue that plaintiffs have failed to state the circumstances constituting fraud with particularity. They argue that plaintiffs merely allege general use of email, telephone, mail, and fax and fail to include the time, place, and contents of any false representations. They allege that plaintiffs fail to allege which defendants made misrepresentations. They insist that even considering the additional facts alleged in the RICO Case Statement, it is clear that the Chandelier Defendants' email and telephone correspondence was

nothing more than routine business communication and that their use of the mail was almost exclusively to provide payments to Scheffy Construction. Similarly, the Larimore Defendants argue that plaintiffs failed to allege any specific actions by either Larimore Defendant.

In response, plaintiffs insist that the allegations of their complaint meet the heightened pleading requirements of Rule 9 because they have included the date and subject and/or contents of several communications. They say they have alleged these communications were made by the defendants as part of a scheme to defraud the plaintiffs and to deprive them of money and property rights. They argue that they should not be required to detail every email, text message, and phone call over a period of seven years. They note that it is not reasonable to expect plaintiffs to have information or details about chain of custody of funds flowing between and among the defendants because this information is in the hands of the defendants themselves.

Plaintiffs cite the following as establishing the necessary predicate acts:

- The July 8, 2016, email from the defendants laying out the deal.

- The defendants provided an estimate of profits to be between $2.8 and $3.2 million.

- The circulation of the draft Operating Agreement in November 2016 that included an addendum stating that the deal entailed purchasing, renovating, and selling the properties.

- The August 11, 2017, email from Lyons to Robert III and Larimore stating that while cash flow was good, they would soon need to obtain additional capital sources.

- On December 19, 2017, the defendants reached back out to Rob Jr. to discuss a $125,000 investment in the deal.

- On December 21, 2017, Rob Jr. responded back and discussed the contribution. The defendants agreed that documentation would be prepared as Rob Jr. requested, but no such documentation was ever provided.

- On December 22, 2017, Rob Jr. provided a check written out to Chandelier NOLA for $125,000.

The Court finds these allegations are insufficient to show the necessary predicate acts. Not one identifies a fraud or misrepresentation. Instead, they can only reasonably be interpreted as preliminary negotiations of a legitimate business deal  (e.g., the July 2016 email laying out the structure of the deal is clearly a suggestion of what "we" may "feel like the best set up is;" the estimate of profits is by its own description an estimate; and the email stating that cash flow was good but additional capital would be needed contemplates some further investment). At best, the December 2017 communications (by an unnamed defendant via an unidentified medium) to Rob Jr. to discuss the $125,000 "investment" and representing that documentation would be provided may amount to a breached promise as to documentation (though the plaintiffs themselves are uncertain as to what the terms of the "investment" were meant to be). But no facts alleged could lead to the conclusion that any of these communications were made fraudulently:  even if the statements about *future* documentation, *future* profits, and *future* capital needs—by their nature not knowable with certainty—could be found false or misleading statements, there are no facts alleged from which to conclude that such statements were intentionally so. Furthermore, not one cited allegation mentions the Larimore Defendants with particularity and most do not identify any specific defendant at all. The general reference to communications by "defendants" is the kind of "lumping together" of defendants that cannot defeat a motion to dismiss. See In re Mastercard, 132 F. Supp. at 476.

The Court finds that plaintiffs have failed to allege predicate acts of its RICO claim with sufficient particularity to survive a motion to dismiss as to any of the defendants.

ii.   *"Pattern" of Racketeering Activity*

While the failure to allege predicate acts would, on its own, result in dismissal of the RICO claim, plaintiffs also fail to state a "pattern" of any such predicate acts. "To prove a 'pattern of racketeering activity,' a plaintiff must show at least two predicate acts of racketeering that are related and amount to or pose a threat of continued criminal activity." Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1139–40 (5th Cir. 1992). Not only must plaintiff show the minimum number of predicate acts, but plaintiff must also show the acts are "*related* and amount to or pose a threat of *continued* criminal activity." Id. "Predicate acts are 'related' if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Burzynski, 989 F.2d at 742 (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 240 (1989)).

"'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 241 (1989). To satisfy a closed period of continuity, the criminal acts must extend over a substantial period of time:  a few weeks or months is not enough. Id.  at 242. An open period of continuity may be established where there is a specific threat of repetition or where the predicate acts are part of an entity's regular way of doing business. Id.  at 242-43.

For example, in World of Faith World Outreach Center Church, Inc. v. Sawyer, the plaintiff church sued the individuals and companies involved with broadcasting a television report highly critical of the church's televangelist's fundraising practices. 90 F.3d 118, 120 (5th Cir. 1996). The report asserted that the televangelist collected millions of dollars in donations but never prayed over the thousands of prayer requests. Id.  at 121. After the broadcast, the church's membership

and financial giving dropped sharply and numerous local, state, and federal investigations were initiated. Id. The church alleged that the defendants sought to drive the church out of business through a pattern of racketeering acts. Id. According to the court:

> The alleged racketeering acts included interstate transportation of stolen computer disks; theft of donations, Church mail, and other Church property by certain defendants or by bank, mail-handling, or Church employees who had been persuaded to help the defendants; wire fraud in the form of false statements made during broadcasts; a scheme to deprive the Church, its bank, its mail-handling contractor, and its law firm of the honest services of its loyal employees; and obstruction of justice.

Id.  The Fifth Circuit held that a pattern had not been shown because "[t]he alleged acts were all part of a single, lawful endeavor—namely the production of television news reports concerning a particular subject." Id. at 123. Further the court rejected plaintiffs' argument that examples from news reports and other lawsuits by other people dissatisfied with how the defendants had portrayed them in other news programs did not demonstrate predicate illegal acts as the defendant's regular way of doing business. Id.  at 123-24.

Similarly, the court in Buryznski found that a pattern could not be established where a single, otherwise lawful transaction was at issue. Id.  at 742-43. As discussed above, that case involved an alleged fraudulent scheme to put a doctor out of business. Id.  at 737.  The alleged acts were found related because they concerned an alleged pattern of activity for the purpose of avoiding paying the insurance claims for the doctor's treatment and to put the doctor out of business. Id. at 742. However, the court of appeals found plaintiffs had not shown continuity because all of the acts took place over the course of the doctor's litigation to obtain payment and that litigation had ended. Id.  at 742-43.

Here the Chandelier Defendants argue that plaintiffs have failed to allege a pattern of racketeering activity because there are no facts alleged showing that defendants' acts constitute or

threaten long term criminal activity. Instead, they insist that the issues raised by plaintiffs in their complaint concern an agreement that was limited in scope—to purchase, renovate, and sell two properties. They argue there is no specific threat of repetition. They argue further that the mere allegation that the defendants' plan was "likely" to shift profits into similar projects throughout the country is conclusory and insufficient.

Similarly the Larimore Defendants argue that the actions plaintiffs complain of constitute a legitimate and singular commercial endeavor which, like in World of Faith and Burzynski, does not amount to a "pattern" of racketeering activity.

Plaintiffs argue that they have plead more than two predicate acts within the requisite ten year period and that they have alleged sufficient details to establish a future threat of repetition. They argue that the instances of alleged fraud were related, went on for several years, and showed a regular way of doing business. They argue further that RICO liability is not limited to traditional organized crime and extends to garden variety fraud cases. They say they have sufficiently shown fraud occurring over several years, including multiple interrelated fraudulent real estate schemes across multiple states.

As discussed above, the Court has already found that plaintiffs have not plead the required predicate acts with sufficient particularity. Even if their allegations were adequately specific, no facts alleged amount to a specific threat of repetition or could show that the acts alleged amount to the defendants' regular way of doing business. As defendants argue, all facts alleged here concern a single business deal with a beginning and a certain end. This is similar to World of Faith, where the Fifth Circuit found a pattern had not been established because the alleged acts were part of the production of a single news program.[9] 90 F.3d at 123.

---

[9] Although the plaintiffs here allege that the debts remain outstanding, the alleged bad acts of fraudulently inducing the plaintiffs to enter the business deal have completed.

In their RICO Case statement, plaintiffs say that the defendants' purpose was to profit off of the services and money of the plaintiffs and "likely to invest/shift the profits in/to similar 'deals' and/or other companies, including Chandelier TN and RAM Floors, to flip/develop additional properties throughout the country." This vague allegation is not sufficient to show a pattern. In World of Faith, the plaintiffs also sought to establish a pattern by citing news reports about and lawsuits by other subjects of television programs created by the defendants who also complained about how they had been portrayed. Id. at 123-24. As in World of Faith, plaintiffs' conclusory allegation (not even contained in the Complaint) that the defendants likely funneled money into similar property development deals (which may or may not have involved fraud) is not sufficient to establish continuity. Id.

### iii.   Enterprise

The statute defines "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An "association in fact" must have a structure, that is "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 945-46 (2009). But further structural attributes like a hierarchy, a chain of command, membership dues, rules, and regulations, or regular meetings regarding the enterprise's affairs are not required. Id. at 948. Moreover, the requirement that the enterprise exist long enough to pursue a course may be satisfied by "an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." Id.  The concept of an enterprise under RICO has been described as "expansive." Id.

The Chandelier Defendants argue that plaintiffs have failed to establish the existence of an enterprise because they have not alleged any organizational characteristics of an association in fact. They say that the plaintiffs have not provided details about the structure, purpose, roles, function, or course of conduct of the alleged enterprise. They argue that plaintiffs have failed to plead continuity.

The Larimore Defendants argue that even if plaintiffs have adequately alleged the existence of an enterprise, they have failed to allege facts to establish that the Larimore Defendants participated in any alleged conduct of the enterprise. Instead, they argue, plaintiffs have lumped defendants together and alleged that they fraudulently induced the plaintiffs to contribute money, legal services, property management services, and construction services to defendants' scheme. But they have plead no specific facts as to the Larimore Defendants.

Plaintiffs oppose, arguing that to establish an association-in-fact enterprise, they must only allege that the association-in-fact functioned as a continuing unit and remained in existence long enough to pursue a course of conduct. They argue that it is sufficient to have alleged that the Larimore Defendants are partners to the deal. They say that Larimore was copied on numerous correspondence and participated in numerous phone calls, but the Larimore Defendants never objected to any of the information provided by the other defendants to the plaintiffs. Plaintiffs argue that if this was a routine business dispute, then the Larimore Defendants would also be seeking to collect money owed to them. Because they do not appear to be a victim, plaintiffs insist, they must be part of the alleged enterprise.

The plaintiffs accurately state the standard that they must meet to show an association-in-fact enterprise. It is not necessary to show the kinds of structural attributes that the Chandelier Defendants seem to suggest. Nonetheless, the Court does not need to address whether the facts

alleged are sufficient to establish an enterprise, because plaintiffs have failed to establish two other essential elements to state a RICO claim.

### iv.   Conclusion

Because the Court finds that plaintiffs have failed to plead facts sufficient to establish any racketeering activity, let alone a "pattern" of racketeering activity, plaintiffs' RICO claims against all defendants must be dismissed.

### c.   Louisiana Racketeering

"Because of the parallel between the RICO and Louisiana's statutes, federal decisions in this area are persuasive." State v. Touchet, 1999-1416 (La. App. 3 Cir. 4/5/00), 759 So. 2d 194, 197; see CamSoft Data Sys., Inc. v. S. Elecs. Supply, Inc., 2019-0745 (La. App. 1 Cir. 7/2/19), 2019 WL 2865256. Defendants here raise the same deficiencies as to plaintiffs' claims under Louisiana's Racketeering Act (failure to plead a "pattern," failure to plead "racketeering activity," and failure to plead an "enterprise") as they do for the federal RICO claim discussed above. Plaintiffs concede that the same standard applies.

Accordingly, for the same reasons that the Court finds that plaintiffs' federal RICO claims must be dismissed, the Court finds that plaintiffs' claims under the Louisiana Racketeering Act must be dismissed.

### d.   Prescription of Tort Claims

Defendants argue that certain tort claims against them have prescribed. Specifically, they allege that plaintiffs' claims for civil conspiracy, fraudulent inducement,[10] conversion, unjust enrichment,[11] and detrimental reliance have prescribed.

---

[10] The fraudulent inducement claim is only asserted against the Chandelier Defendants and only they seek to dismiss it.

[11] Only the Larimore Defendants assert that the unjust enrichment claim has prescribed.

"Louisiana law provides a one- year prescriptive period for civil conspiracy claims as they are delictual actions." Horn v. Transdev Servs., Inc., No. CV 20-3323, 2021 WL 4312694, at *7 (E.D. La. July 29, 2021), report and recommendation adopted, No. CV 20-3323, 2021 WL 4311050 (E.D. La. Sept. 22, 2021); see AGEM Mgmt. Servs., LLC v. First Tennessee Bank Nat. Ass'n, 942 F. Supp. 2d 611, 619–20 (E.D. La. 2013). Similarly, claims for fraud, negligent misrepresentation, intentional misrepresentation, and fraudulent inducement are subject to a prescriptive period of "one year from the date plaintiff knew or reasonably should have known of a defendant's fraudulent act." AR Factoring, LLC v. Commonwealth Applied Silica Techs., LLC, No. CV 19-1906, 2020 WL 5889311, at *2 (E.D. La. Oct. 5, 2020). The "injury" that triggers the prescriptive period on a fraudulent inducement claim "occurs at least by the time the victim consents to the contract." Bertrand, 2022 WL 1235469, at *4. "Like other delictual actions, conversion has a one year prescriptive period." Richard v. Wal-Mart Stores, Inc., 559 F.3d 341, 345 (5th Cir. 2009) (footnote omitted). Claims for detrimental reliance have been subject to a one or ten year prescriptive period. See Copeland v. Wasserstein, Perella & Co., 278 F.3d 472, 479 (5th Cir. 2002). Defendants contend that a one year prescriptive period applies here because plaintiffs' claim is based on alleged misrepresentations and misfeasance. See Ames v. Ohle, 2011-1540 (La. App. 4 Cir. 5/23/12), 97 So. 3d 386, 393, decision clarified on reh'g (July 11, 2012), writ denied, 2012-1832 (La. 11/9/12), 100 So. 3d 837. Plaintiffs do not contest this characterization and the Court finds the one year prescriptive period applicable.

The Larimore Defendants argue that plaintiffs' state law tort claims have prescribed because prescription began to run, at the latest, in March 2021, when the defendants allegedly stopped promising the plaintiffs would be paid for their work and investments. This was more than one year before plaintiffs filed suit on February 14, 2023.  The Chandelier Defendants argue that

alleged injuries occurred before then, at the time of the September 2018 payment application, the rental of the 628 Esplanade apartments in October 2019, the sale of 625 Esplanade in December 2019, and Rob Jr.'s investment in 2017.

Plaintiffs respond that the prescriptive period does not begin to run until they knew or should have known that they were the victim of fraud.  Plaintiffs argue that they only gradually became aware of the possibility of injury. They say that when they inquired about the representations that induced them to undertake the business arrangement, defendants took steps to prevent or defer the plaintiffs from learning of the misrepresentations. They add that when they demanded payment, defendants would string them along with promises of phone calls to discuss a payment plan.

As the Larimore Defendants point out, plaintiffs have alleged that "the Enterprise continued to promise to Scheffy that they would be paid for their work and the investments until March 2021." (Rec. Doc. 1, at 11). On the face of the complaint, plaintiffs knew or should have known by March 2021 that they may have been the victims of a civil conspiracy, fraudulent inducement, conversion, or detrimental reliance. The explanation they offer up in opposition has not been plead. Moreover, the explanation is entirely unspecific—what did defendants do to prevent plaintiffs from learning of the alleged misrepresentations and, importantly, when did they do it? How could defendants have been making promises of a payment plan after February 14, 2022, when plaintiffs allege that they continued to promise payment **until** March 2021? Plaintiffs have not shown that facts could be plead to defeat prescription.

The court finds that plaintiffs' claims for civil conspiracy, fraudulent inducement, conversion, and detrimental reliance must be dismissed as prescribed.

The prescriptive period for an unjust enrichment claim, however, is ten years. <u>Richard</u>, 559 F.3d at 345. Plaintiffs' unjust enrichment claims have not prescribed.

> *e.   Prescription of Suit on Open Account*

A suit on open account is subject to a liberative prescriptive period of three years. La. Civ. Code art. 3494. "This prescription commences to run from the day payment is exigible. It accrues as to past due payments even if there is a continuation of labor, supplies, or other services." <u>Id.</u> art. 3495.

Here, plaintiffs allege that they submitted their Final Pay Application in September 2018. They allege that the final inspection was completed in December 2018. Plaintiffs did not file suit until more than four years later on February 14, 2023. Plaintiffs do not separately address defendants' claim that their suit on open account has prescribed by, for example, explaining that payment was due on a later date. Instead, they appear to rely on their tolling arguments above, which the Court has already found insufficient.

Plaintiffs' suit on open account must be dismissed as prescribed.

> *f.   Bad Faith Breach of Contract*

If an obligor breaches a contract in bad faith, it is "is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." La. Civ. Code art. 1997. "Bad faith is not 'mere bad judgment or negligence[;] it implies the conscious doing of a wrong for dishonest or morally questionable motives.'" <u>Hi-Tech Elec., Inc. of Delaware v. T&B Constr. & Elec. Servs., Inc.</u>, No. CV 15-3034, 2018 WL 2268168, at *7 (E.D. La. May 17, 2018) (quoting <u>Volentine v. Raeford Farms of La., LLC</u>, 201 So. 3d 325, 338 (La. App. 2 Cir. 2016)). Thus, "to hold a defendant liable for bad faith breach of a contract, a plaintiff must show that (1) the defendant consciously breached the contract (2) for dishonest or morally questionable motives." <u>Brown v.</u>

Phoenix Life Ins. Co., 843 F. App'x 533, 543 (5th Cir. 2021). For example, in Hi-Tech, the district court dismissed plaintiff's bad faith breach of contract claim where plaintiff alleged that defendant had intentionally breached the  memorandum of understanding and misrepresented its reasons for doing so, but had not alleged that the breach was malicious.  2018 WL 2268168, at *7.

The Chandelier Defendants do not seek dismissal of plaintiffs' breach of contract claim. But they argue that plaintiffs' bad faith breach of contract claim must be dismissed because plaintiffs do not sufficiently allege bad faith. They insist that plaintiffs fail to allege any facts to support finding that any breach of contract was malicious. The Chandelier Defendants argue further that plaintiffs' bad faith breach of contract claim must be dismissed because plaintiffs' allegations that payments were made on the contract cannot be reconciled with the allegations of bad faith.

Sheffy Construction argues that it has sufficiently alleged defendants' bad faith because the alleged RICO scheme is based on defendants' dishonest and immoral behavior. It also points to the numerous references to "fraud," "misrepresentation," "specific intent to deceive," etc. It admits that it has received payments, but insists this does not preclude a claim for bad faith breach because—they contend—Chandelier NOLA never intended to pay the debt in full. It claims that Chandelier NOLA used the initial payments to keep Scheffy Construction working and invested in the deal.

In reply, the Chandelier Defendants argue that just as plaintiffs have failed to meet the Rule 9(b) pleading standard as to their RICO claims, they have failed to allege sufficient factual matter to support their claim for bad faith breach of contract. They submit that plaintiffs' numerous references to fraud, misrepresentations, etc., are merely a formulaic recitation of the elements.

22

The Court finds that Scheffy Construction has failed to state a claim for bad faith breach of contract. Although it may be plausible to infer from the facts alleged that Chandelier NOLA intentionally breached the Construction Contract by failing to pay the Final Pay Application, no facts alleged could support finding that this alleged breach was malicious. No fact alleged could support finding that Chandelier NOLA never intended to pay the debt in full as Scheffy Construction argues in opposition. If one could infer a plausible claim for bad faith breach of contract from non-performance of a contractual obligation alone, every single breach of contract claim would also state a bad faith breach of contract claim. That is not the case. Plaintiffs' claim for bad faith breach of contract must be dismissed.

g.   *Unjust Enrichment*

"A person who has been enriched without cause at the expense of another person is bound to compensate that person." La. Civ. Code art. 2298. This remedy "is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule." Id.  "The mere fact that a plaintiff does not successfully pursue another available remedy does not give the plaintiff the right to recover under the theory of unjust enrichment." Walters v. MedSouth Rec. Mgmt., LLC, 2010-0353 (La. 6/4/10), 38 So. 3d 243, 244

Thus, a plaintiff who has pled a delictual action "is precluded from seeking to recover under unjust enrichment." Id.  The Louisiana Supreme Court in Walters reversed the district court and granted the exception of no cause of action as to plaintiffs' unjust enrichment claim, even where plaintiff's tort claim was held prescribed. Id.  Citing Walters, courts have held that this same rule applies where plaintiff has alleged a breach of contract action.[12] Westbrook v. Pike Elec., L.L.C.,

---

[12] In one 2014 case cited by plaintiffs here, the Middle District of Louisiana allowed plaintiff to plead an unjust enrichment claim in the alternative to a breach of contract claim. Cent. Facilities Operating Co. v. Cinemark USA, Inc., 36 F. Supp. 3d 700, 708 (M.D. La. 2014). But that court did not cite Walters. Instead, it cited two pre-Walters decisions from Louisiana courts of appeals.

799 F. Supp. 2d 665, 672 (E.D. La. 2011); Gen. Acc. Ins. Co. of Am. V. Aggreko, LLC, No. 11-CV-1682, 2012 WL 6738217, at *2 (W.D. La. Dec. 28, 2012).

The Chandelier Defendants argue that plaintiffs' unjust enrichment claims must be dismissed because plaintiffs have other remedies available—their breach of contract claim. Similarly, the Larimore Defendants argue that the unjust enrichment claim must be dismissed because plaintiffs have other remedies available because plaintiffs have plead other causes of action against the Larimore Defendants. They insist that the fact that plaintiffs fail to successfully pursue their other claims does not give rise to a claim for unjust enrichment.

Plaintiffs argue that the defendants here refuse to acknowledge their contractual obligations. They argue that they should be allowed to plead their unjust enrichment claim in the alternative.

Plaintiffs' unjust enrichment theory is that defendants retained the benefit of the investment, materials, equipment, labor, and services provided by the plaintiffs' without paying for them. As to the materials, equipment, labor and services provided pursuant to the Construction Contract, plaintiffs cannot state a claim because their remedy is their breach of contract action. By "investment," it appears that the plaintiffs are referring to Rob Jr.'s $125,000 payment to Chandelier NOLA, which has been described by plaintiffs as an investment and/or a loan. This injury, too, is subject to other remedies:  Rob Jr.'s claim for breach of contract against Chandelier NOLA. Plaintiffs' unjust enrichment claims must be dismissed because they are subject to other remedies.

h. *Single Business Enterprise*

"[T]he legal fiction that a corporation is a distinct legal entity separate from the individuals who comprise it may be disregarded when a corporation is organized and controlled in such a way that it is merely an adjunct of another corporation." Lee v. Clinical Rsch. Ctr. Of Fla., L.C., 2004-0428 (La. App. 4 Cir. 11/17/04), 889 So. 2d 317, 323, writ denied, 2004-3002 (La. 2/18/05), 896 So. 2d 33. "The 'single business enterprise' doctrine is essentially a theory for imposing liability where two or more business entities act as one." Brown v. ANA Ins. Grp., 2007-2116 (La. 10/14/08), 994 So. 2d 1265, 1272. "Generally, under the doctrine, when corporations integrate their resources in operations to achieve a common business purpose, each business may be held liable for wrongful acts done in pursuit of that purpose." Id. 1267 n. 2.

Louisiana courts consider the following non-exhaustive list of factors in determining whether to treat a group of entities as a single business enterprise:

> 1. corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control;
> 2. common directors or officers;
> 3. unified administrative control of corporations whose business functions are similar or supplementary;
> 4. directors and officers of one corporation act independently in the interest of that corporation;
> 5. corporation financing another corporation;
> 6. inadequate capitalization ("thin incorporation");
> 7. corporation causing the incorporation of another affiliated corporation;
> 8. corporation paying the salaries and other expenses or losses of another corporation;
> 9. receiving no business other than that given to it by its affiliated corporations;
> 10. corporation using the property of another corporation as its own;
> 11. noncompliance with corporate formalities;
> 12. common employees;
> 13. services rendered by the employees of one corporation on behalf of another corporation;
> 14. common offices;
> 15. centralized accounting;
> 16. undocumented transfers of funds between corporations;
> 17. unclear allocation of profits and losses between corporations; and

18. excessive fragmentation of a single enterprise into separate corporations.

Lee v. Clinical Rsch. Ctr. Of Fla., L.C., 2004-0428 (La. App. 4 Cir. 11/17/04), 889 So. 2d 317, 322, writ denied, 2004-3002 (La. 2/18/05), 896 So. 2d 33; see Bona Fide Demolition & Recovery, LLC v. Crosby Const. Co. of Louisiana, 690 F. Supp. 2d 435, 444 (E.D. La. 2010).

Of note, "some of the factors are perfectly consistent with legitimate, efficient business operations, such as common control, common employees, officers, and directors, shared offices, and some form of centralized accounting." Id.  445. In Bona Fide Demolition, the district court considered whether, using the single business enterprise theory, it could "fuse" companies that did not have minimum contacts with Louisiana together with a company with sufficient contacts for purposes of exercising personal jurisdiction. Id.  446–47 (E.D. La. 2010). Factors weighing in favor of applying the single business enterprise theory to exercise personal jurisdiction over one of the companies included that the companies used the same office space and shared resources, including servers and email accounts; the same individual controlled the financial operations of both companies; the finances of the companies were intermingled, including via undocumented interest-free "handshake loans" that were never repaid, withdrawal of funds from one company's account by the other company, and a joint bank account; and the company did not observe corporate formalities like the issuance of stock, annual shareholder meetings, formal board meetings, and corporate authorization for major transactions. Id.  at 446-47.

In Shell Offshore Inc. v. Eni Petroleum US LLC, the district court focused on the allegations of the complaint alone and found that plaintiff had pleaded sufficient facts to state a claim for breach of contract against an entity related to the contracting party under the single business enterprise theory. No. CV 16-15537, 2017 WL 4812409, at *5 (E.D. La. Oct. 25, 2017). The factors in favor of doing so included: the related entity and the contracting party were both

wholly owned subsidiaries of the same company; the related entity and the contracting party allegedly shared a common board of directors and the president of the related entity allegedly directed non-payment of certain expenses at issue; the related entity and contracting party allegedly commingled funds; the companies were allegedly undercapitalized; the related entity allegedly paid the salaries of the contracting party; the related entity allegedly failed to provide separate bank accounts and failed to hold regular, separate director meetings; the related entity allegedly provided extensive services on behalf of the contracting party, including handling the day to day operations and carrying out administrative and clerical functions for the contracting party; and the companies shared the same headquarters. Id.  at *4-5.

But in Andretti Sports Marketing Louisiana, LLC v. Nola Motorsports Host Committee, Inc., the court held that the plaintiff had failed to sufficiently plead that the contracting party and race-track owner were a single business enterprise for purposes of asserting a claim for breach of a racing services agreement. 147 F. Supp. 3d 537, 561 (E.D. La. 2015). The plaintiff alleged that almost every officer of the contracting party was a member or agent of the race-track owner, that the two companies shared a corporate office, that they shared an accountant, that the contracting party was controlled by the race-track owner, and that the contracting party was undercapitalized. Id.  at 558. But the court found the allegation of unified control to be conclusory and unsupported by any factual allegations. Id.  It similarly found no factual support for the allegation of inadequate capitalization and the allegation that the distinction between the individuals in their roles as directors of the contracting party and their roles as employees of the race-track owner were a legal fiction. Id.   at 558-59. The court also considered that the racing services agreement included a provision acknowledging that the contracting party and the race-track owner were not affiliated.

Id. at 558. The court found the complaint insufficient to establish the applicability of the single enterprise theory. Id. at 561.

Here, plaintiffs contend that Chandelier TN and Chandelier NOLA are a single business enterprise. They point out that they have alleged that Lyons is the owner of both entities, that both entities have a principal place of business in Nashville, Tennessee, and all the Chandelier defendants worked together towards a common goal—the business deal and the RICO scheme.

The Chandelier Defendants argue that plaintiffs have failed to identify the common owners, directors, officers, or employees or explained how either of these entities are administratively controlled. Nor have they pointed to any commingled assets, identified any centralized accounting, or showed any undocumented fund transfers.

The Court finds that the allegations in the complaint are wholly insufficient to state a claim for liability of Chandelier TN under a single business enterprise theory. The mere allegation of shared ownership and a shared principal business location is simply not enough. Countless legitimately separate entities meet these criteria. There is not a single specific factual allegation implicating Chandelier TN. Plaintiffs offer no factual basis to conclude that it was involved in the deal, the Construction Contract, or the alleged promises. Plaintiffs' claims against Chandelier TN are dismissed without prejudice.

i. *Alter Ego*

"There are limited exceptions to the rule of non-liability of shareholders for the debts of a corporation, where the court may ignore the corporate fiction and hold the individual shareholders liable. Generally, that is done where the corporation is found to be simply the "alter ego" of the shareholder." Riggins v. Dixie Shoring Co., 590 So. 2d 1164, 1168 (La. 1991). This may occur "when the shareholders disregard the requisite corporate formalities to the extent that the

corporation ceases to be distinguishable from its shareholders." Id.  Courts consider the following non-exclusive list of factors: "1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings." Id.  "Louisiana courts are reluctant to hold a shareholder, officer, or director of a corporation personally liable for corporate obligations, in the absence of fraud, malfeasance, or criminal wrongdoing." Id.  at 1168.

Courts have held that "where fraud or deceit is absent, other circumstances must be so strong as to clearly indicate that the corporation and shareholder operated as one." Harris v. Best of Am. Inc., 466 So. 2d 1309, 1315 (La. Ct. App. 1985). In Harris, the court of appeals reversed the trial court's finding that a sole shareholder was personally liable, observing that "Plaintiff had the heavy burden of producing clear and convincing evidence to show that [the owner] was the 'alter ego' of [the company]. The factors cited by plaintiff are not frequent, serious, or exceptional so as to warrant piercing the corporate veil to hold [the owner] liable on [the company's] contract with plaintiff." Id.  at 1316. But in Louisiana Newpack Shrimp, Inc. v. Ocean Feast of China, Ltd., the court found that plaintiff alleged sufficient facts to support an alter ego claim where the owner had written a letter suggesting that the company was undercapitalized and he had comingled his personal funds with those of the company. No. CV 19-12948-WBV-KWR, 2021 WL 516631, at *9 (E.D. La. Feb. 11, 2021).

Plaintiffs contend that Lyons is the alter ego of Chandelier TN and/or Chandelier NOLA because Lyons used his status as the sole member and manager of these entities to commit fraud against plaintiffs. They argue that the test for application of the alter ego doctrine has been met here because they have alleged the Chandelier Defendants' fraudulent behavior in handling the

deal and their continuous attempts to avoid paying plaintiffs for their money, time, and services invested. They say that because Chandelier TN has moved to dismiss the case against it for lack of personal jurisdiction, the Court can conclude that the Chandelier Defendants are working to block a just result.

The Chandelier Defendants argue that plaintiffs have failed to state a claim for Lyons' liability as an alter ego of Chandelier TN and/or Chandelier NOLA. They say plaintiffs have alleged merely that Lyons used his status as sole member of Chandelier TN and sole member and manager of Chandelier NOLA to commit fraud against plaintiffs and that Chandelier TN and Chandelier NOLA are the instrumentalities employed by Lyons to attempt to ensure personal insulation from the debts, damages, and deceitful acts of Lyons against the plaintiffs. They argue these allegations lack the requisite specificity to apply the alter ego doctrine.

The Court finds that plaintiffs have failed to allege sufficient facts to support a plausible claim against Lyons as an alter ego of the entities.  There is no allegation of commingling of funds, failure to follow statutory formalities, or undercapitalization. The allegations of fraud are vague and non-specific. As discussed in the RICO section, although plaintiffs may have alleged broken promises, they have not alleged any facts sufficient to conclude that defendants intentionally made false statements. Moreover, the allegations of the Complaint fail to specifically describe any fraud by *Lyons* as an individual under the cloak of an entity he controls. Plaintiffs' claims against Lyons are dismissed without prejudice.

   2. *Rule 12(b)(2) Motion to Dismiss*

Chandelier TN argues that the claims against it must be dismissed for lack of personal jurisdiction. Plaintiffs argue that jurisdiction is established via the nationwide service of process provisions of RICO. Because plaintiffs have failed to state a RICO claim, it cannot serve as a basis

for personal jurisdiction. Nor have plaintiffs stated a claim against Chandelier TN under a single business enterprise theory to the extent this theory can be used to impute contacts of Chandelier NOLA to Chandelier TN. And, in any event, as discussed above, plaintiffs have failed to state any claim against Chandelier TN. The Rule 12(b)(2) Motion to Dismiss is DENIED as moot.

<u>Conclusion</u>

As discussed above, plaintiffs have failed to allege sufficient facts to state a claim under the federal RICO statute or Louisiana's Racketeering Law. These claims are dismissed. Plaintiffs' claims for civil conspiracy, fraudulent inducement, conversion, and detrimental reliance are prescribed because plaintiffs knew or should have known by March 2021 of their potential tort claims. These claims are dismissed with prejudice. Plaintiffs' suit on open account is also prescribed because it was filed more than three years after payment was due. This claim is dismissed with prejudice. Plaintiffs have failed to plead sufficient facts to state a claim for bad faith breach of contract. This claim is dismissed. Plaintiffs have failed to state a claim for unjust enrichment because they have other remedies available. These claims are dismissed with prejudice. Plaintiffs have failed to plead sufficient facts to establish liability of Chandelier TN as part of a single business enterprise or the liability of Lyons as an alter ego of Chandelier NOLA or Chandelier TN. These claims are dismissed. Accordingly,

IT IS ORDERED that the Chandelier Defendants' Partial Motion to Dismiss (Rec. Doc. 18) is GRANTED; Chandelier TN's Motion to Dismiss Pursuant to Rule 12(b)(2) (Rec. Doc. 17) is DENIED as moot; and the Larimore Defendants' Motion to Dismiss (Rec. Doc. 19) is GRANTED. Only Scheffy Construction and Rob Jr.'s breach of contract claims against Chandelier NOLA remain.

New Orleans, Louisiana, this 28th day of February, 2024.

Janis van Meerveld
United States Magistrate Judge